# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

      v.

MICHAEL KING,

    Defendant.

No. 1:19-cr-39

Judge John Z. Lee

## MOTION TO SUPPRESS EVIDENCE

Defendant Michael King, through undersigned counsel, respectfully moves under Federal Rule of Criminal Procedure 12(b)(3)(C) to suppress evidence unlawfully obtained in this case.

### Facts

Defendant was arrested by Chicago Police Officers on January 10, 2019, at about 10:13 p.m. in the vicinity of 79th Avenue and Bishop Street, Chicago, IL. Following his arrest, CPD officers recovered an RG model 23 .22 caliber revolver from Defendant's right jacket pocket. The revolver forms the basis of the current charge against defendant of possession of a firearm by a felon. Below is the chronology of events

On January 10th at 2009 hours, OEMC received a wireless 911 call from an anonymous caller, who stated that an individual was walking in the vicinity of 79th & Throop when he pulled out a gun and started shooting. The caller described the individual as "black, kinda tall, maybe over 6 feet, with dark clothes on, maybe bald"

wearing a "dark puffed jacket" and did not appear to be wearing a hat. The caller stated that the individual fired about three shots and was walking westbound. When asked for his name and number, the caller declined to provide it, stating he "would rather not say". *See* Exhibit 1 (911 call audio).

At 2011 hours, CPD dispatch alerted units to "shots fired 79th and Throop, caller states there is a male black walking westbound, tall build, six foot, dark-colored puffy jacket, shot 3 times, nothing further". Exhibit 2, at 05:18 (CPD dispatch audio). Moments later, CPD dispatch also reported "nothing on the ShotSpotter" in relation to the call, and advised the responding officers of this information. *See id.* at 05:39. ShotSpotter is a gunshot detection system employed by CPD:

> ShotSpotter has three primary components: acoustic sensors, a Location Server application, and the ShotSpotter Flex user interface. The ShotSpotter Location Server is operated by ShotSpotter and runs on a virtual server hosted at a remote facility, the ShotSpotter Flex user interface resides on the customers PC or mobile device. Acoustic sensors are deployed in geographic areas that are designated by the customer.
>
> Each sensor is triggered by impulsive sounds in its environment. The acoustic measurements of these impulsive sounds and the exact time that they were detected are transmitted to the Location Server as probable gunshots. The Location Server analyses the data received and determines if the impulsive sound can be geographically located and classified as gunfire. If the impulsive sound can be located and classified as gunfire, Location Server reports the incident to the ShotSpotter Service Operations Center where a human operator reviews the incident for classification accuracy. The reviewed incident is then published to the customer's user interface. The user interface, referred to as the Flex Alert Console, provides an actionable view of the incident with an emphasis on the time and location of the incident. Gunfire incidents are typically detected, located, classified, reviewed, and published to the customer in under 60 seconds.

Exhibit 3, at 2 (ShotSpotter enhanced incident report). ShotSpotter detection, however, is subject to significant limitations and potential false positives or negatives, and so it must be corroborated by other investigative sources:

2

> ShotSpotter detects and properly geo-locates (provides latitude and longitude) 90% of detectable outdoor incidents within the coverage area, accurate to within a circle whose radius is 25 meters (~82ft). ShotSpotter does not guarantee 100% detection because real world environments may contain intervening buildings, topography, foliage, periods of increased traffic or construction noise, and other urban acoustic noises that may either prevent the sound of a gunshot from being detected by the sensors(s), or may change or modify the audio characteristics of the sound of a gunshot so that it no longer matches the sensor(s) detection parameters.
>
> Other factors, such as obstructed or attenuated muzzle blast, weapon discharge in an enclosed space, or if the weapon discharged is of .25 or smaller caliber, may also prevent the sensor(s) from not detecting all, or some shots fired.
>
> Acoustical data analysis of a gunfire incident is complex and not comprehensive. The data and conclusions above should be corroborated with other evidentiary sources such as recovered shell casings, and witness statements.

*Id.* As the report itself notes:

> **Disclaimer**
> This Enhanced Incident Report has been produced using data automatically generated by the ShotSpotter system and has not been independently reviewed by our Forensic Engineers. Although it provides precise trigger-pull location and timing as determined real-time, this report should only be used for initial investigative purposes. This report has been prepared solely for the purpose for which it is provided. Nothing herein shall to any extent substitute for the independent investigation of the shooting incident. If a court-admissible document is required, please request a Detailed Forensic Report that is prepared by ShotSpotter Forensic Engineers.

*Id.* (emphasis added).[1]

Body-worn camera (BWC) footage captured the responding officers' actions. *See* Exhibit 4 (BWC video). The relevant recording begins at 22:11:13. At 22:11:46, the dispatch report of "nothing on the ShotSpotter" can be heard over the in-car radio. At 10:12:05, one officer in the vehicle states, "Is that a black puffy jacket?", to which another officer states, "I think so," followed by "That's him." The initial officer then

---

[1] The day after Defendant's arrest, the ATF reported a missed incident to ShotSpotter. A manual review of the ShotSpotter system was conducted and found "sounds resembling gunshots with a time stamp of 22:08:46." *See* Exhibit 3. None of this information was available to the responding officers at the time of Defendant's detention and arrest.

3

makes a statement to the effect of, "Do you want [unintelligible]". The other officer responds, "No, I do not want you to do that, we're gonna get out and talk to him." At 22:12:17, the vehicle stops and the passenger side door opens. The passenger exits the vehicle at 22:12:20 and immediately draws his weapon, shouting "Let me see your hands", followed immediately by the backseat passenger with her weapon also drawn. The video shows Defendant responds by turning around with his hands in the air:



Defendant is put up against a wall and handcuffed at 22:12:48:



At 22:13:04, prior to asking any questions, one of the arresting officers begins searching Defendant:

4



At 22:13:11, the officer states, "we got a weapon". At 2213 hours, the responding officers reported to dispatch that Defendant had been detained. *See* Exhibit 3, at 06:50. Moments later, the officers reported that they had recovered a weapon. *Id.* at 07:10. Defendant was subsequently transported to the station for booking.

From beginning to end, the entire sequence lasted less than two minutes.

## Argument

As the U.S. Supreme Court summarized in *Navarette v. California*, 572 U.S. 393, 396-97 (2014) (cleaned up),

> The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity. The reasonable suspicion necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability. The standard takes into account the totality of the circumstances—the whole picture. Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.

These standards apply to investigative stops based on anonymous tips. *See id.* (citing

*Alabama v. White*, 496 U.S. 325 (1990), and *Florida v. J.L.*, 529 U.S. 266 (2000)). The analysis in this context involves two steps: (1) whether the anonymous 911 call was sufficiently reliable to credit the allegations, and (2) whether the information known to the responding officers, including the 911 call, created a reasonable suspicion that criminal activity was afoot. *Id.* at 309, 401. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *J.L.*, 529 U.S. at 271.

In this case, the caller contacted 911 through a wireless telephone. While the caller indicated that he had personally seen the individual discharging a firearm and gave a description, the caller declined to identify himself when asked. Moreover, because the call was made from a wireless telephone, the 911 system could not immediately verify the caller's location. *See, e.g.*, Ben Bradley, *WGN Investigates puts Chicago's 911 system to the test*, WGN9 (May 19, 2017); *see also* Federal Communication Commission, 911 Wireless Services ("Since wireless phones are mobile, they are not associated with one fixed location or address."). This is dissimilar to cases such as *Navarette* that found a tip reliable in part because the caller's location and identity could be verified through the 911 system. *Cf. Navarette*, 572 U.S. at 400-401 ("A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity.").

There was also reason to doubt the caller's report, based on the information

6

the responding officers knew at the time.[2] Moments after the responding officers received the dispatch for shots fired, dispatch also reported "nothing on ShotSpotter", indicating that no gunfire in the vicinity was detected by the system. It is clear that this information was not only known to CPD but also to the officers personally, given that the report can be heard coming over the radio in the BWC recording.

Consequently, the officers knew only that an anonymous caller had relayed information that appeared to be unsupported by the ShotSpotter system, which was specifically designed to detect gunshots. Those circumstances required further investigation before detaining anyone. *See United States v. Lopez*, 907 F.3d 472, 481 (7th Cir. 2018) ("When officers know the bare identity but little else about an informant, they still must conduct and rely upon independent investigation to corroborate a tip before seizing a person.").

Even leaving aside the reliability problems with the tip itself, there was no reasonable basis for the responding officers to believe that Defendant personally was involved in criminal activity. The caller identified the alleged shooter only as a tall African American male wearing a dark puffy jacket walking westbound. In the context of a cold January night in an area of Chicago with a large African-American population, this description is exceptionally generic and does not provide much in the way of clear identification. Additionally, the caller reported shots fired at 79th and Throop, while Defendant was detained by the officers less than three minutes later

---

[2] The timestamp for the BWC recording is in Zulu time, which is six hours ahead of Chicago local time.

nearly a quarter mile away at 79th and Bishop:



But rather than investigating the situation and talking to Defendant, the officers immediately leapt out of their vehicle with guns drawn and handcuffed and searched Defendant within moments. A frisk is permissible only if the officer has a reasonable suspicion that the person is armed and dangerous. *See United States v. Williams*, 731 F.3d 678, 688 n.2 (7th Cir. 2013). "[A]n officer performing a Terry stop may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is 'armed and dangerous.'" *Id.* at 686. Importantly, the mere fact that an officer is responding to a call involving weapons is not enough by itself to justify a reasonable belief that a particular individual is armed and dangerous. *Cf. id.* at 687 ("while officers were

8

responding to a weapons call, that fact could not give rise to a reasonable belief that Mr. Williams, personally, was armed and dangerous").

Here, all that the officers responding to the call knew at the times was that an anonymous 911 caller whose identity could not be verified reported that a black male wearing a puffy jacket had fired a gun, a fact which was not corroborated by ShotSpotter. Under the circumstances, the officers had no reasonable suspicion not only that criminal activity was afoot but that Defendant was both involved with it and himself armed and dangerous. As the Seventh Circuit summarized in *Williams*,

> The government is required to show that Officer Jesberger's frisk was supported by articulable facts that could establish specifically that Mr. Williams was armed and dangerous. The facts, here, are much more general, and could be applied to practically any person that had been around the area when the officers showed up that night. Indeed, similar facts could support a search of practically anyone who happens to be near a high-crime area at night when police are called. That is the very evil that the *Terry* court was concerned with unleashing, and the reason that the *Terry* court restrained the ability to frisk. Accordingly, we are obliged to conclude that Officer Jesberger's frisk of Mr. Williams was unconstitutional.

*Id.* at 688 (cleaned up).

The situation is the same here, and it requires the same result. The evidence obtained from the unconstitutional stop and search should be suppressed.

Respectfully Submitted,

/s/ James G. Vanzant
Attorney for Defendant

James G. Vanzant, Esq.
BLAINE & VANZANT, LLP

9

922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
E-mail: jgv@blainevanzant.com