UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 19 CR 39 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| MICHAEL KING | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
<u>MOTION TO SUPPRESS EVIDENCE</u>**

Approximately three minutes after a concerned citizen placed a 9-1-1 call relaying information about a man who had just fired a firearm three times in the area of 79th and Throop, CPD officers stopped the defendant, who was alone, and who generally matched the description provided by the caller. After failing to comply with the officers' repeated requests to show his hands and then requests to get on the ground, the defendant was handcuffed and patted-down, resulting in the recovery of a firearm from defendant's jacket pocket. As a result, defendant was charged by superseding indictment with one count of being a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g)(1).

The Court should deny the defendant's motion to suppress because the officers had reasonable suspicion to believe that the defendant was involved in criminal activity and was armed. Specifically, the detailed 9-1-1 call and the officers' observations at the scene—including the defendant's continued failure to follow the officers' commands—provided ample reasonable suspicion to justify his stop and pat down.

I.       Factual Background

The following factual background is taken from the discovery provided in this case, including the report of arrest attached as Government's Exhibit A.

On January 10, 2019, at approximately 10:09:23 p.m., a concerned citizen placed a 9-1-1 call to report that he had just observed a man pull out a gun and fire three shots using a firearm. *See* Def. Ex 1. The caller stated that he was near the intersection of 79th and Throop, and had just observed a black male, about six feet tall, wearing a dark, puffy jacket, possibly with a skull cap, walking westbound on 79th Street. The caller stated that he observed the man pull out a gun and fire three shots. *Id*.

Specifically, the caller stated, "This guy was just walking, uh, westbound on 79th Street, about 79th and Throop, and he just pulled out a gun and start shooting." The caller described the shooter as "black, kinda tall, maybe close to six feet, with dark clothes on, maybe a dark, dark winter puff jacket." The caller stated, "he let off . . . about three shots," and that the shooter was "walking westbound." When the operator asked the caller whether the shooter was wearing a hat, the caller responded, "You know what from here, it looked like he didn't have a hat on. If he did, it had to be a skull cap or something like that, but it didn't look like he had a hat on." When the operator asked the caller his name and number, the caller responded, "Well, I'd rather not say other than just that it happened." When the operator asked the caller to confirm the location of 79th and Throop, the caller responded, "Right, on 79th Street, and he was walking westbound." The operator

asked where the shooting happened, and the caller responded, "on 79th street, it had to be about yeah 1300 west[1] something like that." *See* Defense Exhibit 1.

At approximately 10:11:18 p.m., CPD zone dispatch personnel relayed the caller's information over the zone dispatch radio. *See* Defense Exhibit 2. Specifically, zone dispatch relayed, "Shots fired. 79th and Throop. 7-9 and Throop. Caller states that there is a male black, walking westbound, tall, six foot, dark color puffy jacket. Shot three times. Nothing further." *Id*. Three responding officers, Officers Carozza, Moreno, and Valentine, acknowledged receipt of the dispatch information, and responded with their beat number, "613 Robert." *See* Gov. Ex. A. Zone dispatch informed the officers that there was nothing on the shot spotter. *See* Defense Exhibit 2 at 5:17 to 5:54 minutes.

Officer Valentine's body worn camera video (BWC) captured a portion of the zone dispatch information. *See* Defense Exhibit 4 at 00:30 to 00:50. All three officers were in the same patrol car traveling eastbound on 79th Street approximately four blocks from the intersection of 79th Street and Throop, which was the intersection where the 9-1-1 caller had indicated he had seen the man fire the gun. In less than one minute, the officers arrived at 79th Street and Bishop, which is three blocks west of Throop, and observed the defendant walking on 79th Street. The officers observed that the defendant was walking westbound on 79th Street approaching

---

[1] According to the map attached as Government Exhibit B, the intersection the caller described is approximately 1300 South Throop Street in Chicago.

3

Bishop Street, that he was approximately six feet tall, and was wearing a black puffy jacket.[2] *See* Defense Exhibit 4 at 00:56 to 1:59.

At approximately 10:12:08 p.m., as the officers approached the defendant, Officer Carozza, who was in the front passenger seat of the squad car, asked, "Is that a black puffy jacket?," referring to the information relayed by the dispatcher. Officer Moreno, who was driving, responded, "That's him. That's him." *See* Defense Exhibit 4 at 00:56 to 1:05. As depicted by the BWC, defendant was walking alone and no one else was in his immediate vicinity.

At approximately 10:12:18 p.m., Officer Moreno stopped the vehicle and Officer Carozza exited the vehicle, approached the defendant, who had one of his hands in his pocket, and told the defendant, "Let me see your hands." Government Exhibit A at 8. Defendant, who had initially been walking westbound on 79th Street, did not show his hands. Instead, he began to walk southbound on Bishop, tried to walk away from the officers and stated, "Hell naw." Officer Carozza repeated his command stating, "let me see your hands." Defendant continued to walk away without displaying his hands as instructed. Officer Carozza, and Officer Valentine, who by then had exited the back passenger side of the squad vehicle, both immediately drew their weapons as Officer Carozza repeated for the third time, "hands up." Defendant continued to walk and repeat "hell naw."

---

[2] Defendant's height is listed as 6'1" in CPD records.

The image below, taken from the BWC of Officer Valentine, depicts the defendant standing at the intersection of 79th Street and Bishop, and depicts Officer Carozza as he ordered the defendant to show his hands:



After being told approximately four times to show his hands, the defendant finally complied and put both of his hands in the air. Both Officer Carozza and Officer Valentine told defendant "get on the ground" at least a dozen times. Defendant refused to comply and continued to move away from the officers. Once other officers arrived on the scene, the defendant was handcuffed as requested by Officer Carozza.

Once handcuffed, Officer Carozza conducted a pat-down search of the defendant and recovered a .22 caliber firearm from inside the defendant's jacket pocket, which he immediately reported over his radio. *See* Defense Exhibit 4 at 1:05

to 1:59. Once the pat-down search concluded, the defendant was taken into custody. *See* Defense Exhibit 4 at 2:25 to 3:48. The firearm, which had a capacity of six rounds, was loaded with three live .22 caliber rounds. Gov. Ex. A at 8.

## II.  Argument

This Court should deny defendant's motion to suppress without holding an evidentiary hearing. At the time of the seizure, the officers had ample basis to reasonably suspect that the defendant was engaged in criminal activity and possessed a weapon. The information provided by the 9-1-1 caller was sufficiently reliable because it reported a detailed eyewitness account that was nearly contemporaneous with the reported shooting. The information provided to the officers was sufficiently detailed and specific and thus provided reasonable suspicion to justify stopping the defendant. It was also reasonable for Officer Carozza to initiate a pat-down search of the defendant for officer safety given all of the circumstances, including the reported shooting and defendant's failure to comply with lawful commands.

### A.  The information provided by the 9-1-1 caller was sufficient to create reasonable suspicion.

Under *Terry v. Ohio*, 392 U.S.1 (1968), law enforcement may briefly detain a defendant for investigative purposes if that detention is "based on reasonable suspicion that the stopped individual has or is about to commit a crime." *United States v. Bullock,* 632 F.3d 1004, 1012 (7th Cir. 2011) (quoting *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009). For a stop to fall within the bounds of *Terry*, law enforcement must be aware of specific and articulable facts giving rise to

6

reasonable suspicion, and the degree of intrusion resulting from the stop must be reasonably related to the known facts. *Id*. Reasonable suspicion is more than a hunch, but less than probable cause, and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). It requires "some minimal level of objective justification for making a stop," given the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). A seizure, for purposes of *Terry*, occurs only "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Bady*, 503 F. App'x 481, 484 (7th Cir. 2013). Given the potential dangers involved in conducting investigatory stops, "*Terry* allows an officer to conduct a pat-down search if the officer has articulable facts that led him or her to believe that the individual could be armed or present a threat to others." *United States v. Hernandez–Rivas*, 348 F.3d 595, 599 (7th Cir. 2003); *see also Terry*, 392 U.S. at 27.

    A 9-1-1 call reporting an emergency can provide the sole basis for reasonable suspicion. The Seventh Circuit has repeatedly recognized the particular duty of police officers to speedily respond to emergency situations reported by individuals through the 911 system. *See, e.g., United States v. Drake*, 456 F.3d 771, 774 (7th Cir. 2006); *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) ("A 911 call is one of the most common—and universally recognized—means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help. This fits neatly with a central purpose of the exigent circumstances (or emergency) exception to the warrant requirement,

namely, to ensure that the police . . . are able to assist persons in danger or otherwise in need of assistance.").

In *Navarette v. California*, 572 U.S. 393 (2014), the Supreme Court identified three factors that make an anonymous tip reliable enough to create reasonable suspicion, specifically that the caller: (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing. *Id.* at 399-401.[3]

The facts here are in line with the *Navarette* factors. First, the caller asserted eyewitness knowledge of a shooting and he gave a detailed description of what the caller had observed about the shooter. Specifically, the caller stated "this guy was just walking, uh, westbound on 79th Street, about 79th and Throop, and he just pulled out a gun and start shooting." The caller provided further details regarding what the shooter looked like and what he was wearing. The caller described the shooter as "black, kinda tall, maybe close to six feet, with dark clothes on, maybe a dark, dark winter puff jacket." When asked whether the shooter was wearing a hat, the caller stated, "You know what from here, it looked like he didn't have a hat on. If he did, it had to be a skull cap or something like that, but it didn't look like he had a hat on." These are the types of details that Courts have cited as sufficiently reliable. *Drake*, 456 F.3d at 774-75.

Second, the words used by the caller during the 9-1-1 call were consistent with him having placed the call contemporaneous with the event he described. The

---

[3] An officer need not be personally aware of all of the "specific and articulable" facts justifying a stop, so long as a law enforcement officer who is aware of such facts relays his or her reasonable suspicion to the officer effecting the stop. *United States v. Nafzger*, 974 F.2d 906, 908 (7th Cir. 1992).

caller stated, "This guy was just walking, uh, westbound on 79th Street, about 79th and Throop, and he just pulled out a gun and start shooting." The caller offered specific details, stating, "he let off . . . about three shots," and that the shooter was walking westbound. This is the sort of contemporaneous report that the Supreme Court has held especially reliable, that is, statements made about an event "soon after perceiving that event," which "negate[s] the likelihood of deliberate or conscious misrepresentation.'" *Navarette*, 572 U.S. at 400.

Third, it is undisputed that the caller used the 9-1-1 emergency system, which the *Navarette* Court cited with approval. The Supreme Court explained that 9-1-1 calls allow for "identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id*. For this reason, defendant's arguments suggesting that the call was unreliable because it was placed using a cellular phone that is not associated with a fixed location, or because the caller did not provide his name, are not determinative. As the *Navarette* Court noted, the 911 system permits law enforcement to verify important information about the caller. *Id*. at 401.

Accordingly, where, as here the call satisfies all three of the *Navarette* factors, the information provided by the caller was reliable enough to create reasonable suspicion justifying the stop.

Earlier this year, the Seventh Circuit approved of a stop based on very similar circumstances. In *United States v. Adair*, 925 F.3d 931 (7th Cir. 2019), an officer arrived to the described location within two minutes of receiving a crime-in-

progress alert from a 9-1-1 operator based on information "freshly provided by the 911 caller." *Id.* at 935. In responding to the call, the officer approached a group to learn more about what was happening and observed a man matching the description that closely matched the 9-1-1 caller's description. *Id.* The Seventh Circuit held that the Fourth Amendment required no more to justify the stop because the defendant both sufficiently matched the 9-1-1 caller's description and he reacted in a way that justified a *Terry* stop. *Id.* In the *Adair* Court's words, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Id.* (ci*ting New Jersey v. T.L.O.*, 469 U.S. 325, 346 (1985)). "[P]erfection is not the measuring stick." 925 F.3d at 936. As the *Adair* Court stated, "[T]he Fourth Amendment did not require [the officer], upon seeing that Adair was wearing a long-sleeved athletic shirt but not (literally) a hoodie, to disregard information from the 911 caller that proved largely corroborated. Nor did it require him to disregard Adair's evasion and instead return to his police car and leave the scene. The decision to stop Adair was well within reason." *Id*.

Here, as in *Adair*, the defendant both sufficiently matched the 9-1-1 caller's description and reacted in a way that justified the stop. The caller's description not only matched the defendant's race, gender, height and clothing, to include that he was not wearing a hat, but it was accurate to the defendant's location and his direction of travel – westbound on 79th Street.

Importantly, it is undisputed from the audio recording that the zone dispatcher relayed information to the officers that was nearly identical to what the

10

caller stated during the call. The dispatcher stated, "Shots fired. 79th and Throop. 7-9 and Throop. Caller states that there is a male black, walking westbound, tall, six foot, dark color puffy jacket. Shot three times." The officers knew the shooter's location, direction, gender, race, height, clothing, and crime. What is more, everything the officers knew was consistent with the officers' observation of a particular individual, defendant, prior to initiating the stop. In short, the caller provided law enforcement with the right place, the right time, and a description of the right clothing. The defendant was walking alone with no other individuals nearby who matched the caller's description. Accordingly, the 9-1-1 call was reliable enough to create reasonable suspicion. *See Id.* at 934-36.

Defendant argues that the caller's information was less than reliable because the officers knew that no gun shots had been detected by the ShotSpotter system. Dkt. 42 at 7. But this fact did not mean that the caller's information was inaccurate – it only meant that the caller had not been corroborated by that particular system. As in *Adair*, the absence of ShotSpotter traffic did not require the officers to disregard information from the caller that proved largely corroborated. Based on their own observations of the defendant wearing the clothing the caller described and walking in the direction and at the location where the caller described, the officers were able to corroborate much of the caller's information.[4]

Defendant's reliance on *United States v. Lopez*, 907 F.3d 472 (7th Cir. 2018), is misplaced. Dkt. 42 at 7. In *Lopez*, the defendant was stopped based on an

---

[4] Subsequently, ShotSpotter was able to locate sounds resembling multiple gunshots with a time stamp of 22:08:46, which was less than a minute before the 911 call was received.

informant's tip to law enforcement about how a drug transaction typically occurred, that is, that the defendant drove a particular car and used a particular garage to exchange drugs for money. 907 F. 3d at 482. The Seventh Circuit held that the stop was not justified by the informant's tip because "the officers' observations that day simply did not corroborate, even roughly, the informant's story." *Id*. The same is not true in this case. For the reasons described above, nearly every detail the caller provided was confirmed by the officers' independent observations.

> **B. The pat-down search was justified.**

Defendant also argues that the officers impermissibly frisked him even though they did not have reasonable suspicion to believe that he was armed and dangerous. Dkt. 42 at 8.

In the course of an authorized investigatory stop, an officer may proceed to conduct a protective pat down when confronting facts and circumstances giving rise to a reasonable suspicion that the individual has a weapon and otherwise poses a danger. *See Terry*, 392 U.S. at 27.

Under the totality of the circumstances here, Officer Carozza properly performed a pat-down search. As discussed above, the defendant matched the caller's description of a person who not only possessed but also discharged a firearm three times. The officers had arrived to the defendant's location within three minutes of the 9-1-1 call about shots fired. No more was required to justify the officers' belief that the defendant might have been armed and dangerous.

But there was more. Officer Carozza first told the defendant, "let me see your hands," and the defendant did not do so and began to walk away. Officer Carozza repeated his command and the defendant again refused to comply. Officer Carozza repeated the command for the third time, and the defendant still did not comply. Both Officers Carozza and Valentine told defendant to "get on the ground" at least a dozen times, and he refused to comply with that directive, too. The failure to follow a lawful command can prompt concerns for officer safety, which may justify an officer's belief that a suspect may have a weapon. *See United States v. Gibson*, 2018 WL 3275571 at * 11 (N.D. Ind. Jan. 29, 2018) (c*iting United States v. Maclin*, 313 Fed. Appx. 886, 889 (7th Cir. 2009)). These circumstances also justified the pat down search for a weapon.

Defendant makes much of the fact that the officers immediately displayed their weapons. Dkt. 42 at 8. Under the circumstances, such a display is justified by well-established Seventh Circuit precedent. Where the suspect "is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is a commonplace, police may protect themselves by displaying their weapons." *United States v. Lechuga*, 925 F.2d 1035, 1040 (7th Cir. 1991).

Lastly, defendant's reliance on *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013) is also misplaced. In *Williams* the Seventh Circuit considered an anonymous 911 report that a large group of people with guns were making noise late at night in a known high-crime area. *Id*. at 684. The Court concluded that the 911 call permitted an investigatory stop of those present but, without more, did not

justify an officer's decision to go further and randomly pat down one of the persons detained. *Id.* at 686–88. Specifically, there was no individualized suspicion necessary for the more intrusive step of frisking because the 9-1-1 caller had not provided "any information that would have identified [the defendant] as one of the individuals in possession of a weapon," nor could his "general behavior … possibly support a reasonable suspicion that [the defendant] was armed and dangerous." *Id.* at 687.

Nothing about the facts in *Williams* are analogous to the facts here. Unlike in *Williams*, the 911 caller in this case identified a specific person by his clothing and location, and stated with specificity what he had personally observed him do. In this way, Officer Carozza did not "randomly pluck [defendant] from a larger group and then, without any reasonable basis for believing [he] may be armed and dangerous, subject him to a pat down." *Adair*, 925 F.3d at 938.

Accordingly, because the officers had reasonable suspicion to believe that defendant was armed and dangerous, the evidence obtained as a result of the pat-down search should not be suppressed.

  **C.**  **Defendant's motion should be denied without an evidentiary hearing.**

It is well established that "[e]videntiary hearings are not required as a matter of course." *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007)). "District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d 562, 564

14

(7th Cir. 2011). To obtain an evidentiary hearing relating to suppression of evidence, the defendant "bears the burden of making a prima facie showing of illegality." *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992).

For the reasons discussed above, the government's position is that no evidentiary hearing is necessary.

### III. Conclusion

WHEREFORE, the government respectfully requests that this Court deny defendant's motion to suppress.

                    Respectfully submitted,

                    JOHN R. LAUSCH, JR.
                    United States Attorney

                    By: /s/ *Tobara Richardson*
                    TOBARA S. RICHARDSON
                    Assistant United States Attorney

October 21, 2019