# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 19 CR 39-1 ) |
| MICHAEL KING, | ) Judge John Z. Lee ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

In January 2018, Chicago Police Department ("CPD") officers stopped and frisked Michael King, finding a revolver in his front pocket. Shortly thereafter, King was indicted as a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). King now moves to suppress the Government's evidence against him [42]. For the reasons below, the motion is granted.

## Background[1]

At 10:09 p.m. on January 10, 2019, Chicago's Emergency Management Office received a 911 call. Def.'s Ex. 1, 911 Call at 0:11, ECF No. 42. According to the caller, a man had just displayed a gun, fired three shots at the intersection of West 79th Street and South Throop Street, and then walked away. *Id*. at 0:11 to 0:43. When

---

[1] This factual summary draws on the exhibits submitted by the parties. Neither side requested an evidentiary hearing, nor did their briefs highlight any disputed facts, so the Court finds that an evidentiary hearing is not necessary to resolve the motion. *See United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007) ("Evidentiary hearings are not required as a matter of course; a district court need conduct a hearing only when . . . there are disputed issues of material fact.").

the dispatcher pressed for details, the witness described the shooter as "black, kinda tall, maybe over six feet" and wearing a "dark puffed jacket." *Id*. After refusing to provide his name and phone number, the caller hung up. *Id*. at 1:08 to 1:38.

Within moments, the dispatcher relayed the tipster's account to the police officers closest to 79th and Throop. Def.'s Ex. 2, CPD Dispatch at 5:18 to 5:32, ECF No. 42. She characterized the suspect as "a male black walking westbound, tall build, six-foot, [and wearing a] dark-colored puffy jacket." *Id*. Almost immediately, another dispatcher chimed in to note that the CPD's ShotSpotter system—a system that monitors for sounds of gunfire—had not detected any gun shots in the area. *Id*. at 5:45.

A minute later, police officers driving down 79th Street spotted a man who they thought matched the 911 caller's description. Def.'s Ex. 4, CPD Body Cam Video, 1:05 to 1:28, ECF No. 42. It was King. *Id*. The officers pulled over, exited their vehicle, immediately aimed their guns at King, and commanded him to "show [his] hands." *Id*.

For the next few seconds, King did three different things at the same time. *Id*. He put his hands up. *Id*. Facing the officers, he began to slowly back away from them. *Id*. And he shouted the same phrase— "oh hell no"—again and again. *Id*.

In the meantime, additional officers began to arrive at the scene. *Id*. at 1:22. Like their fellow officers, they immediately trained their weapons on King and yelled various instructions. *Id*. About twenty seconds after the encounter began, one of them approached King and grabbed his wrist. *Id*. at 1:05 to 1:28. Another forced

2

King against a wall and searched him for weapons. *Id.* at 1:34 to 1:45. While this was taking place, King exclaimed that he was frightened by the officers and had done nothing wrong. *Id.*

Discovering a .22 caliber revolver in King's jacket pocket, the officers handcuffed him and took him to a police station, where he proceeded to make certain incriminating statements. *Id.*; *see* Gov.'s Ex. 1, Police Report at 3, ECF No. 59. About a week later, King was indicted as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See* 2d Superseding Indictment at 1, ECF No. 54. King's motion to suppress the revolver and his subsequent statements is now before the Court.

## Analysis

King maintains that the Government's evidence should be excluded because the police lacked reasonable suspicion to stop and frisk him. As a threshold matter, the parties disagree about when a stop occurred. The timing of the stop matters because it determines what information the officers had available to them. If the stopped occurred when the police officers exited their vehicles and aimed their guns at King, the 911 call is the only possible justification for the stop. If a stop occurred later, King's subsequent behavior may factor into the reasonable-suspicion analysis.

It is well-established that "a person has been 'seized' within the meaning of the Fourth Amendment only if . . . a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (citation omitted). But that "states a *necessary*, but not a *sufficient*, condition." *Id.* at 628. "[F]or a seizure to have taken place, the subject [must also] yield to a show of

3

authority from the police or be physically touched by the police." *Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005) (citation omitted). As with other Fourth Amendment tests, the "standard for determining when a suspect has yielded to a show of authority is an objective one, viewed from the perspective of a reasonable officer under the circumstances." *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010) (citation omitted).

While one might argue that the police officers "stopped" King as soon as they exited their vehicle, pointed their weapons at him, and instructed him to put his hands up, Body Cam Video at 1:10, "[i]n order to effect a seizure . . . either the officer must physically touch the suspect or the suspect must yield to the officer's show of authority by stopping his flight or otherwise showing his surrender." *Schaefer v. Goch*, 153 F.3d 793, 796 (7th Cir. 1998) (citing *Hodari D.*, 499 U.S. at 626); *see White v. Williams*, No. 94 C 3836, 1998 WL 729643, at *4 (N.D. Ill. Oct. 16, 1998) (no stop when officer approached with gun and badge displayed because defendant's movement was not limited); *Marquez v. Jackson*, No. 13 C 3278, 2016 WL 4720017, at *4 (N.D. Ill. Sept. 9, 2016) (recognizing that an officer who approaches a suspect "with his gun drawn and his badge on display" has asserted his authority). Whether and when a stop takes place depends on King's reactions and actions.

If King had simply raised his hands when ordered to do so and stood still, a seizure would have occurred then and there. *See U.S. v. Mosley*, 743 F.3d 1317, 1327 (10th Cir. 2014) (finding that a suspect "manifested compliance with the officers' orders" by "put[ting] his hands up"). But he did more: King repeatedly shouted "no

4

hell no" and slowly backed away from the officers. Under these circumstances, a reasonable officer could have concluded that King was refusing to submit to his authority. It follows then that a stop did not take place until one of the officers actually took hold of King's wrist. *See Brendlin v. California*, 551 U.S. 249, 254 (2007) (confirming that "the use of physical force" to restrain a suspect qualifies as a seizure).

The next question is whether the police had reasonable suspicion to stop King when they did. As a general matter, a warrantless stop violates the Fourth Amendment unless the officer has reasonable suspicion that a crime has taken place. *See D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). To satisfy that standard, an officer must have "more than a hunch" that a crime has occurred; "he must be able to point to specific facts that suggest that a stopped individual has committed, was committing, or is about to commit an offense." *D.Z.*, 796 F.3d at 754. Here, the government relies on: (1) the anonymous tip to 911, and (2) King's reaction once he was told to "show his hands" at gun point. Neither is enough to justify a finding of reasonable suspicion.

To support reasonable suspicion, "a tip [must] be reliable in its assertion of illegality [and] in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). *Navarette v. California* illustrates how courts should analyze those factors. 572 U.S. 393 (2014). In *Navarette*, a tipster complained that a silver Ford F-150 pickup truck, with the license plate 8D94926, had run her off the road. *Id.* at 399. When officers spotted that truck, they followed it for five minutes without seeing any "additional suspicious conduct," but stopped the driver anyway. *Id.* at

5

403. Because the caller described "a specific vehicle" and predicted its direction of travel, the Court concluded that the tip identified a determinate person. *Id.* at 400–03. And because "the appearance of a marked police car [often] inspire[s] more careful driving," the Court decided that the driver's five minutes of good behavior did not undercut the tip's assertion of illegality. *Id.* at 403.

Compared with *Navarette*, which the Supreme Court deemed "a close case," the 911 call here supplies a much weaker basis for a stop. *Id.* at 404. For one thing, the tip failed "to identify a determinate person." *J.L.*, 529 U.S. at 272. As in *Navarette*, the caller here "claimed eyewitness knowledge" of the crime and correctly forecasted King's direction of travel. 572 U.S. at 399. But the similarities end there. By repeating the truck driver's license plate, the *Navarette* tipster pinpointed a particular vehicle. *Id.* By contrast, here, the caller's account of a tall black man wearing a dark puffy coat during January could describe hundreds, if not thousands, of Chicagoans. And the record does not indicate whether King was alone or whether there were other pedestrians in the area.

For another thing, the police officers were informed that the ShotSpotter contradicted the tipster's "assertion of illegality." *J.L.*, 529 U.S. at 272. According to the caller, a man had fired three shots, *see* 911 call at 0:11 to 0:43, but the ShotSpotter system did not detect any gunfire in the area. CPD Dispatch at 5:45. And neither party challenges the ShotSpotter's accuracy.[2] To the contrary, the dispatcher deemed

---

2   According to the manufacturer, the ShotSpotter "geo-locates . . . 90% of detectable outdoor incidents." Def.'s Ex. 3, Incident Report at 2, ECF No. 42. That said, it struggles to detect .22 caliber rounds, which is the type of ammunition that King's revolver fired. *Id.* The

6

the system useful enough to report its results to the responding officers. Coupled with the caller's refusal to reveal his identity, the ShotSpotter report significantly undermines whatever limited reliability the anonymous tip may have had.

When "a tip has a relatively low degree of reliability, more [corroborating] information will be required to establish the requisite quantum of suspicion." *Alabama v. White*, 496 U.S. 325, 330–31 (1990). Attempting to make up for the unreliable 911 call, the Government casts King's "refus[al] to comply" and "[backward] steps" as evasive behaviors that justify a stop. Gov.'s Resp. at 13, ECF No. 59. Even considered in conjunction with the tip, however, the Court finds that those facts do not add up to reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (instructing courts to review the "totality of the circumstances" when making "reasonable-suspicion determinations").

First, King's backward steps suggest surprise, not criminality. It is true that "[h]eadlong flight" and similar "act[s] of evasion" may justify a stop. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). But King did not flee; instead, he took a handful of slow backward steps while continuing to face the officers. Any citizen—law-abiding or otherwise—who is confronted at night by shouting police officers with their guns drawn would feel a similar urge to take a step or two backwards. *See U.S. v. Lowe*, 791 F.3d 424, 434 (3d Cir. 2015) ("[A] few startled steps back in the face of onrushing, armed police officers is entirely consistent with a surprised reaction.").

---

Government does not argue that the responding officers had any reason to believe that King was carrying such a weapon.

7

As for King's "refus[al] to cooperate," the only manifestation of this refusal is his repeated statements of "no hell no" when the officers instructed him to put his hands up and get on the ground. Body Cam Footage at 1:05 to 1:28. But, in the end, King did not flee and subjected himself to seizure and search. Given the circumstances, King's short-lived protestations of "no hell no" are insufficient to support reasonable suspicion. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) (a "refusal to cooperate . . . does not furnish the minimal level of objective justification needed for a detention or a seizure").

Ultimately, the Government bears the burden of showing that a warrantless search or seizure accords with the Fourth Amendment. *See U.S. v. Longmire*, 761 F.2d 411, 418 (7th Cir. 1985). Apart from the questionable tip, however, the Government has failed to highlight any factors that support reasonable suspicion. In a typical stop based on allegedly evasive behavior, the Government introduces testimony from the responding officers about how the suspect's gestures or demeanor signaled criminality. *See, e.g.*, *U.S. v. Adair*, 925 F.3d 931, 934–35 (7th Cir. 2019). Such testimony is conspicuously absent here. Considering the dearth of "specific facts" linking King with a crime, the Court finds that the officers lacked reasonable suspicion to perform a stop. *D.Z.*, 796 F.3d at 754.

The Government cites to *Adair*, but the facts in that case are materially distinguishable. In *Adair*, a tipster reported that she had just seen "a short black man wearing a hoodie" brandish a firearm. 925 F.3d at 936. Arriving at the scene, an officer spotted a group of people, one of whom was "wearing long sleeves," but not

8

a hoodie. *Id*. at 934. Still, given that the encounter took place "on an unusually warm September night," and that the suspect was "the only person [in the location] wearing long sleeves," the officer approached him to ask a few questions. *Id*. In response, the suspect began to make "evasive" movements by weaving through the group and putting others between himself and the officer. *Id*. Around the same time, the policeman noticed a gun-shaped bulge in Adair's pocket. *Id*. Based on these facts, the officer asked Adair to step away from the crowd and for permission to search him. Only when Adair refused did the officer performed a stop and frisk, which the Court of Appeals later endorsed. *Id*. at 937.

*Adair* underscores how little evidence the Government has put forward here. *Adair* featured, among other things: (1) "a high crime area," (2) a 911 call where the "caller gave her first name and phone number", (3) a suspect who weaved in and out of a group to avoid the police, and (4) a noticeable "bulge" in the suspect's pocket. *Id*. at 936. None of these supporting factors are present here. Furthermore, what additional facts we have in this case—such as the ShotSpotter report and King's weather-appropriate puffer jacket—weigh against a finding of reasonable suspicion.[3]

What is more, the Government's effort to equate King's backward steps with Adair's actions also is unpersuasive. Although both King and Adair may have "mov[ed] away" from the responding officers, 925 F.3d at 934, Adair sought "to evade"

---

[3] "[T]he absence of ShotSpotter traffic [in *Adair*]," the Government argues, "did not require the officers to disregard information from the caller." Gov. Resp. at 11. This is true enough, but the responding officer in *Adair* did not consult the ShotSpotter at all. Here, the arresting officers were told before they encountered King that the ShotSpotter had not detected any gunshots in the area in question.

9

the police by weaving in and out of a group of people. King encountered multiple shouting officers who had their guns pointed at him. Rather than turning to evade the officers or flee, King turned his body to face the officers, raised his hands, and took a couple of hesitant steps backwards—not an unreasonable reaction given the circumstances.[4]

Of course, this is not to say that the Fourth Amendment prohibits the police from responding to an informant's tip, even an anonymous one. But where a tip is anonymous and provides only a general description of the suspect, and the police are aware of facts that are inconsistent with the tip, more information is needed before a stop can be carried out. *See U.S. v. Watson*, 900 F.3d 892, 898 (7th Cir. 2018) (listing "options [for investigating a tip] other than an instant *Terry* stop"). For example, the officers could have "talk[ed] with people on the scene" to see if anyone had heard gunshots. *Id*. Or they might have followed King to see if he engaged in any suspicious behavior. *See id.* ("[T]he police could . . . make their own observations about the developing situation."). Whether these investigatory techniques were viable at the time remains unclear, partly because the record is devoid of testimony from the arresting officers. What is clear is that, acting solely on a tip that their own

---

[4] The Government contends that King repeatedly disobeyed the officers' orders to show them his hands, focusing on a single frame of the body camera video and the statements in the police report. *See* Gov. Resp. at 4–5. But a review of the video does not support this depiction of events. It is true that, in the single frame on page 5 of its brief, King appears to have one hand by his side while an officer has a gun pointed at him. But when the footage is viewed at regular speed, King appears to be in the process of complying with the officers' commands. *See* Body Cam Video at 1:05 to 1:28. Perhaps the arresting officers could provide more details to clarify this inconsistency, but they were not presented before the Court.

monitoring system had contradicted, the police confronted King at gunpoint. The Fourth Amendment requires more.

Even assuming that the stop satisfied the Fourth Amendment, the resulting frisk did not. Because frisks constitute "severe . . . intrusion[s] upon cherished personal security," *Terry*, 392 U.S. at 25, "a court must analyze a frisk separately from an initial stop." *Green v. Newport*, 868 F.3d 629, 638 (7th Cir. 2017). And "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009).

*U.S. v. Williams* is instructive. 731 F.3d 678 (7th Cir. 2013). In *Williams*, officers responded to a 911 call warning that "a large group of people [were] being loud and waving guns" in a high-crime area. *Id*. at 686. Observing that one member of that group "had his hands in his pocket or near his waistband, avoided eye contact, and began to move away from the area," the officers frisked him. *Id*. at 686–87. "Even taking every one of those facts [together]" the Seventh Circuit concluded, "they do not support a reasonable belief that Mr. Williams was armed and dangerous." *Id*. at 687.

Here, the police had even less reason to believe that King was armed and dangerous. The ShotSpotter report contradicted the caller's assertion that King had fired a weapon, and, aside from the tip, little else signaled that King was armed. By contrast, in *Williams*, the frisk took place in a high-crime area, and Williams held his hands near his pockets and waistband. *See U.S. v. Christian*, 673 F.3d 702, 709 (7th

11

Cir. 2012) (noting that "90 percent of people who illegally carry weapons conceal them in their waistband or coat pocket.").

The Court appreciates the difficult job that police officers have and the risks that they undertake to safeguard our communities. They often have to make split-second decisions for the sake of their own safety and the safety of others. But the Fourth Amendment does not condone every search or seizure that is performed in the name of safety. Here, based upon the totality of the record, the Court finds that the officers lacked reasonable suspicion to stop and frisk King. When a search or seizure violates the Fourth Amendment, the exclusionary rule requires the suppression of any resulting evidence, unless certain exceptions apply. *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). Because the Government does not invoke any exceptions to that rule, the evidence against King must be excluded.

## Conclusion

For the reasons stated above, King's motion to suppress [42] is granted.

**IT IS SO ORDERED.**     ENTERED 2/11/20

*/s/ John Z. Lee*

_____

**John Z. Lee**
**United States District Judge**